Okay, we will now hear counsel in Martsolf v. Col. Brown. Good morning, Your Honors. My name is Don Bailey from the law firm of me, myself, and I. To please the Court, we have filed an appeal in this matter, and apparently during the process, the Guarnini case came down, and has presented the Court with some questions. We were asked to briefly respond to that. I think a little background helps. The original complaint was a husband and wife, one a civilian employee, the other a Pennsylvania State trooper, western part of the state. James Martsolf was the trooper. His wife was Connie. In a nutshell, Connie was prodigiously pursued by a supervisor seeking sexual liaisons and other things with her. James complained, complained internally in the Pennsylvania State Police, complained to his supervisors, etc. Connie then complained. The Pennsylvania State Police had a very active EEO component to deal with suspect category issues. Oh, excuse me. Do you want a rebuttal time? Yes, ma'am. I had asked for two minutes. You have to ask us. Oh, I'm sorry. That's okay. Two minutes. Okay, thank you. It's been a while since I've been down here. Because we're going to keep everybody else on the schedule, time schedule. I apologize. Sorry about that. In any event, what occurs here is, and I'll try to speak to some of the Granini. I mean, you know, of course, that we've read the briefs. Yes. Yeah, we know the record. Go ahead. Well, what's the matter of public concern? That's what I was going to address. Okay, go ahead. Anticipating what Judge Slobiter was getting at. Yeah. If you notice in the introductory paragraph, second amended complaint, references made to the Kroll, K-R-O-L-L report. For those that are not aware or familiar with Pennsylvania law, there was a very severe problem, a pervasive problem, of sex discrimination and harassment in the Pennsylvania State Police, Executive Order of the Governor. The Kroll Commission was created. One of the defendants in this case, which understanding we didn't know Granini was something which was going to come down in the interim. Nor did I, and it's a reversal of my opinion. Go ahead. Okay. But ironically, the Kroll report was mentioned in the introductory paragraph. And I'm sorry, you must have got by me on that one, Judge. I didn't catch that. No, go ahead. Okay. In any event, Jim and Connie Sue. Now, it's needless for me to comment on Granini and what I think is absolutely atrocious and outrageous and erroneous law, but that's the way I see it. We have to follow it. Well, that's the Supreme Court's decision. It's the law. I'm sorry, ma'am. Yeah. No, let's go. I mean, you didn't answer the question of my colleague. What's the matter of public concern? The matter of public concern had to do with the Kroll report. One of the defendants here, which I was in the process of answering, I apologize for being slow with it, was Michael Patrick. Mr. Patrick actually worked for the Kroll report, was a vendor for the Pennsylvania State Police, interviewed Connie. Connie was very severe, very, very strongly. She was investigated by the Pennsylvania State Police. She withdrew her. Mr. Patrick was one of the defendants whom you withdrew claims against. I believe so. That leads me to wonder just who the proper defendants are here. I believe you withdrew claims against five of the, well, defendants. Yeah, I was not dealing with the case at that time. They were withdrawn. That's correct. They were withdrawn. Yeah. It's not clear to me that anyone other than Major Zank had anything to do with your client's removal. Well, we respectfully disagree with that, if I understand that the Attorney General's argued that, yes. I'm sorry? I understand that the Attorney General's argued that, that we respectfully disagree with that. It takes a troop commander to do these things. I guess what I'm wondering, I don't mean to divert you from the issue of what's of public importance, and maybe you want to address that first. Okay. Before your argument is done, perhaps you can point to me any testimony that shows involvement, personal involvement, by any of those who remain as defendants. I'm puzzled that Major Zank was not a defendant. You may wish to defer that issue until later and proceed. Okay. As to the issue of public concern, it had to do with the accrual report, Connie being questioned on that, and then she was investigated thoroughly by the Pennsylvania State Police. She was charged that she had given inconsistent statements. She was frightened to death. She withdrew from the case. Let me get directly to the point. Have you alleged a pattern of Title VII violations? I don't believe that was alleged initially. For Mr. Martz, for Connie it was, but Connie withdrew from the case. Okay. So we have a husband who complained about what happened to a wife. And supported her. And supported her. And he's fired. No, he was not fired. He was demoted. He suffered a number of ‑‑ Okay. He's no longer on CERN and other things. Among other things, we settled those claims. It was the trial court who sat on this case for two years. Of course, it was a Don Bailey case. But it was a case that sat for two years, and along with a couple of dozen other cases, was dismissed, mostly state police cases. This is one of them. When we went back and tried to argue the CERT issue, the trial judge, Judge Connor, had indicated that we weren't allowed to present that as an issue. There was a time discrepancy in time evidence at one point. Jim had become confused. You read that. Right. You're going to forgive me for interrupting. Sure. Because we want to get to this public concern. Sure. Because I don't understand your articulation of your public concern. Guarnini? Guarnini, Durie, however you want to talk about it. It specifically talks about public concern, and particularly since the wife involved here is no longer involved in the case. What is the matter of public concern that takes it out of that private-public paradigm and says, no, no, it's clearly public? Well, again, if I could connect these thoughts, or at least try to. When Connie began her complaining, the Pennsylvania State Police had set up this internal EEO office. I'm sorry, you're not answering his question. I can't get to it, Judge. I'm trying to, honestly. Well, you've come a very long-about way. I'm sorry it's not short. I really apologize. Go ahead. The fact is that the EEO office was set up. Connie was then investigated. I can't say that any shorter. Connie was investigated. And Mr. Patrick, one of the defendants, was an investigator. And they put together a deal to come in and question Connie to death. They frightened her to death. She was my client initially. And she pulled out of the case because she was scared to death. They were going to charge her with perjury. It's exactly the kind of stuff that the Supreme Court in Guarnini doesn't understand goes on out there in the real world. And it does. And Connie was pulled. They caused a divorce. They lost their children. It was a horrendous, incredible situation. Now, to try to very briefly, Judge Slovitter, answer the response from Paragraph 41 of the complaint, Second Amendment complaint. Plaintiff engaged in protected First Amendment activity by supporting Connie and her complaints of sexual harassment against Defendant Vogel. That was her supervisor. And by voicing his own complaints within the Pennsylvania State Police of inappropriate conduct towards Connie and himself by the defendants. Now, the trial judge found that to be valid. If we're here on that issue again, fine. I mean, what can I do to argue it? The judge found that that was good. He kept in many of our claims. Not the claims against Vogel. No, ma'am. Well, those are settled. Okay. Judge Connor tells us that that claim was withdrawn. Okay. Okay. I sent that in the paragraph by way of what was going on in that case. Vogel was involved with another very famous state police case involving over half a million dollars in damages by one of their female supervisors. There's a horrific problem within the state police over these issues. Those were the matters of public concern. The Kroll report was there. They became involved in this investigation. There were allegations that they were trying to skewer that investigation. That became part of the issue. Judge Connor sat on the stage. As a matter of fact, we could do no discovery for roughly two years, and James Martzoff came back. Connie withdrew from the case. The second amended complaint was filed, and I think, Judge Pollack, you had asked me the issues having to do with the family. Basically, that's what the underlying situation was in terms of matters of public concern. We know what Guarnini says. It's very, very clear, Judge Greenaway. They say that unless you have a matter of public concern that we're not going to apply the petition clause. I mean, we all know that. I wouldn't bore you with I'm sure you know it ten times better than I'll ever know it. But the point is that when we had written this case and we had sat there underneath the discovery, in fairness to us, Guarnini didn't exist. Now we come back, and, of course, you're going to tell us that Guarnini applies, and this case was pending. And the real issue for us in terms of the cert thing that the Attorney General's Office agreed to us should be appealed. And so we, you know, I come in here looking like I'm some kind of dunce or didn't do this or didn't do that. When you start looking at the procedures in the case, the way we were treated in the trial court, and I'm sure everybody knows my issues, but the way we were treated there, we came up here and felt that Mr. Martzoff, on the issue of the cert team, it was a big-ticket item. There was no evidence to support taking him off a cert. In September of 2005, he had been put on a temporary thing from cert because he was complaining. It was a way to say, hey, we don't rock boats around here. We don't complain about these things. Okay? Which the Supreme Court says aren't under Garcetti matters of public concern. And like Enquist, there's no class of one. Everybody knows where the policy's going. I know where it's going. Our appellate courts know where it's going. The issue is, does the law, and Judge Slobodur's right, the law's the law. We have to abide by it. We're confronting it. We're trying to deal with it and respond to it. When we've made the appeal. Thank you, but your time is up. Thank you very much. Thank you. We'll hear you in rebuttal. Ms. Tesoro. Good morning. May it please the Court. I'm Claudia Tesoro. I'm here on behalf of the appellees. The one narrow issue that's before the Court at this point is whether Mr. Martzoff raised a triable issue against any of the six individual defendants, as to whom he didn't withdraw his claims, on his First Amendment challenge to being removed from the CERT team. The Court can affirm under either of two approaches, as we see it. Either for the reasons that the District Court specifically articulated, or. Which were? Which concerned the, I'll call it a sequencing problem, based on Mr. Martzoff's own deposition testimony. Although he had engaged in some protected activity, there could not have been retaliation for that protected activity because the removal from the CERT team occurred before the protected activity, as he described it. That was a pretty straightforward application of summary judgment principles. There was something I didn't understand. I'm sorry, go ahead. Go on. There was something I didn't understand about the sequencing argument. I mean, once the documents became available, it was clear that there was an adverse employment action in October, then followed by one in March, but I thought that the filing preceded both of those. Well. Now, his testimony agreed was equivocal at best, but I think once the documentation became available, it became pretty clear that it did precede the adverse actions. Well, that's true, and that's more or less what I was referring to as the alternative grounds. Now, when you say the documents became available, I trust you're talking about those two memos by Major Zink. And those were only brought forward well after the summary judgment ruling, as you know. But even setting aside the unorthodox procedure that was used, those documents showed that Mr. Martzoff was temporarily removed from CERT in October 2005, early October, and permanently removed in March of 2006, which was not what he had testified to. For three reasons, that doesn't save his Petition Clause claim, which is the only claim that's really at all possibly alive now. He has narrowed the case down to say that the filing of this lawsuit was his protected petition. His support of his wife's earlier complaints is also mentioned, but really not emphasized any longer. The filing of this lawsuit, we submit, was not petitioning on a matter of public concern, as is now required under the Borough of Duryea case. The public concern issue had been addressed by the lower court in the summary judgment decision, and the court had said that if there was a, I'll call it a Garcetti type of claim, a free speech claim raised here, and apparently there was originally, that could not go forward because the speech in question by Mr. Martzoff was strictly about his personal status, not a matter of public concern. The same public concern in that. Well, suppose, that's the point that we have to get into. If he's claiming that there was discrimination generally, then it would be a matter of public concern. Isn't that right? Well, I think that's an overstatement. You have to look at the whole picture. And in this instance, we're talking about his statements. We're no longer talking about his wife's statements. And the allegations about his statements are still, or I shouldn't say still, they are very much about his own situation. Well, suppose, for example, an African American was reduced in rank, and he says, I was reduced in rank because I'm black. Does that state a matter of public concern? I think you would probably need to know a little bit more. I think it could, but I don't think it absolutely guaranteed does. But that's not what we have here. Well, suppose she says, I was, well, but she's not the plaintiff. Exactly. If she were the plaintiff and she was saying that I was discriminated against because I'm a woman and I wouldn't give in to these sexual harassment. Does that state a matter of public concern? Similar to your previous example, I think you could. I know. I think you said earlier during Mr. Bailey's argument something about systemic problems. And certainly if a person comes forward with an individual complaint and portrays it as part of a systemic problem, that would heighten the likelihood that the issue being raised is one of public concern. But you're putting the rabbit in the hat. Suppose the person simply says, I was fired because I was an African American. Period. Is that a personnel decision that's not a matter of public concern? Or is it a matter of public concern? I don't think you can give an absolute answer to that question because it depends upon the context, form, and content of the petition. So if the African American in Judge Sloboder's hypothetical is the only African American ever hired in the history of Philadelphia, obviously not true, but that's the hypothetical. Yeah. Is that a matter of public concern? It could be. But under those facts, maybe it would be. And also I have to say that we're probably remiss if we don't pay attention to the fact that we're at the summary judgment stage here rather than at the motion to dismiss stage. A complaint that simply says what has been described in these examples would probably get past a motion to dismiss because of the possibility that a discrimination allegation raises an issue that is of concern to the public. But a case that advances further and you find out a little bit more about it, it's not so clear cut, or it may not be so clear cut. You know, not long ago, and I can't remember what happened to this case. I was on the case. Oh, I know. We were on a case where three policemen claimed they were fired because they complained about the treatment of an African American. Is that a matter of public concern? I hate to sound like a broken record, and I don't know the details of that case. And it was a Title VII case. If it was a Title VII case, the public concern inquiry isn't part of the analysis. That only is an issue if it's a First Amendment claim. I see. So if you have the individual suing, then it's a Title VII, like my African American. It very likely could come up that way, yes. It wouldn't be a petitioning claim. Probably not. And here we have a petition by Mr. Martzoff, reading it generously, but it's about the question we have to decide is whether his petition raised a matter of public concern. And no matter how much public concern there might potentially have been in Connie's allegations, she's not a plaintiff anymore. She's not arguing that her First Amendment rights were violated. In fact, if anything, her withdrawal from the lawsuit suggests that maybe the issues being raised weren't as important. We can't hypothesize on that. You may remember as another real-world example that some decades back, Judge Green of this court had extensive litigation about racial discrimination within the Pennsylvania State Police. In fact, as I was preparing for this argument and trying to think through in my own mind whether Mr. Bailey's argument in his brief on behalf of Mr. Martzoff that a lawsuit is, as I understand his point, per se, a protective petition, had any legs. And I thought about that, and I said, well, wouldn't that lawsuit be raising an issue of public concern, racial discrimination throughout the state police affecting many people in many ways? And I'd have to say, yes, it probably would be. Could you get your question out? Yeah. I'm sorry if I didn't let you, but anyway. We had planned this conversation before. Great minds think alike. So I'm not standing here and saying that a lawsuit is never a matter of public concern. That's a good example of one that I would say probably was. But that is so different from this case in so many ways that I don't think it should really matter in the court's analysis now. It's because then that Mr. Martzoff, Colonel Martzoff, is one step removed from the actual discrimination. Well, that's part of it. That's part of the context that we are instructed by the Supreme Court to look at. He was, I think, word for word, the various versions of the complaint here, all, even the last one, talk a lot about what allegedly happened to Connie. But Mr. Martzoff's own allegations are more limited, and they are very much personal to him. And that's why the bottom line is he did not, in that petition, raise a matter of public concern. And for that reason, the Duryea case, and I'm sorry, I use that nickname for it, probably does control the outcome here. Even if that weren't so, during the appellant's argument, Judge Pollack raised another important point from the defense side, which is the lack of personal involvement by the actual defendants in this case. Even setting aside the protected conduct issue, there was no evidence brought forth raising a triable issue as to any of those six people's personal involvement in Mr. Martzoff's removal from the CERT team. The record shows that that, or appears to show that that decision was made by Major Zank, who was not a defendant, who was never deposed. The second memo refers to a Captain James E. Torcar being the person to refer any questions to. I don't, to be honest, I don't know even who he is, but he's certainly not a defendant in this case. He must have some awareness of how the CERT team works and how Mr. Martzoff came to be removed from it. But there's no evidence from any of the defendants or from anybody else that actually points in the direction of personal involvement by any defendant in that action. There, to the extent that they were asked about it in their depositions, pages 9 and 10 of our brief summarize what they said, which is essentially, I don't know, it probably was Major Zank. And finally, the third reason that there is a basis for affirming on the substance of this claim is that related to the lack of personal involvement is the lack of any basis to infer a causal connection between the petition and the alleged petition, I'll call it, and Mr. Martzoff's removal from the CERT team. The removal itself, the actual removal didn't come out until March 15, 2006, which was almost six months after this lawsuit that the clearest instance of petitioning that we've got was filed. And in the Laboon case, this court specifically said that three months isn't enough to infer causation from temporal proximity alone. So if that's true, then six months is that much more. Now, I know that the appellant points to the fact that the lawsuit was filed in district court at the end of September and the temporary removal from CERT came about a week after that or some very close amount of time. But I would submit that that is not enough to draw an inference of causation based on the whole record here because the lawsuit being filed still had to be served on the defendants. And if they didn't know they had been served, they, who were not involved in the CERT removal decision anyway, as far as we can tell, certainly could not have been motivated by an effort to retaliate for the filing of the lawsuit a little while earlier. Thank you. Thank you. Mr. Bailey. Two minutes. Straighten out one factual confusion. The lawsuit was filed, I believe, was 7 January. There was a two-week difference. To go back to the questions I think Judge Greenaway had raised about temporal, that relate to temporal proximity, with all due respect, I think my very able colleague had confused the original temporary rescission from CERT certification and the dismissal. The other thing is, Judge Pollack, I don't want to get away without answering your question about, the issue in the Pennsylvania State Police, you don't do any, for example, even limitations that are made in the front office in the Pennsylvania State Police as the restricted and limited duty, for example, are actually effectuated within their system by the commander. It has to, that's the way the system functions. So you're talking about defendants in this case. I think the issue with Major Zank was a red herring, quite frankly. That decision would have been made because the request would have come probably from John Brown, who was the administrative colonel, tenant colonel at that time, or from the commissioner, Mr. Miller, and from the commander. So that would, that would account for those differences, although I don't think I made the, whether I made them or not didn't make any difference in the decisions on who not to sue. I would just like to make one comment in light of the, first of all, you have a suspect category case. In public employment, particularly in a law enforcement agency, for goodness sakes, it has to be a public, a matter of public concern. If you've got, even if it's widespread, we do have the Kroll case here. Kroll was actually involved in the investigation of Connie and what happened to Connie. That is a, I mean, that's tremendous evidence. Doesn't it change, though, since, as you describe her, Connie is no longer a party? I really don't think so. And this is why I would, it's very difficult. We couldn't get additional discovery. We could not get the local court to do anything, okay, in a lot of ways. That maybe is another story for another time. But be that as it may, the thing with Jim was Connie was a PCO. She's a public communication officer, civilian employee. Connie was complaining about what was happening to her. Jim is going to his superiors. He's even going around the chain of command. That goes of some other cases, Darryl Ober's cases. But about that, and that's what Jim ends up being mistreated for. A whole bunch of things, by the way, that we settled, you know, and that sort of gets forgotten in the wash here. Well, okay, I see. Okay. I'm sorry, the red line. I seem to have that. Thank you. Thank you. We'll take this matter under advisement and ask counsel to come up.